# WILDER TILESTON *v.* ABRAHAM S. ULLMAN, STATE'S ATTORNEY, ET AL.

MALTBIE, C. J., AVERY, BROWN, JENNINGS and ELLS, Js.

Argued February 4—decided May 22, 1942.

*Frederick H. Wiggin* and *John Q. Tilson, Jr.,* for the plaintiff.

*Abraham S. Ullman,* state's attorney, with whom, on the brief, were *Philip R. Pastore* and *Fred Trotta,* city attorneys, for the defendants.

ELLS, J. The law of this state forbids the use by any person of any drug, medicinal article or instrument for the purpose of preventing conception; General Statutes, § 6246; and makes liable to prosecution and punishment any person who shall assist, abet, or counsel another to commit such an offense; § 6562.

In *State* v. *Nelson,* 126 Conn. 412, 11 Atl. (2d) 856, the claim was made that these sections should be so construed as not to prohibit a duly licensed physician from prescribing the use of contraceptive devices to a married woman when the general health and well-being of the patient require it. We held that any intention of the legislature to allow such an exception is negatived not only by the absolute language used originally and preserved ever since but also by its repeated and recent refusal to inject an exception. The opinion pointed out, however, that the issue was confined to situations where in the opinion of the physician the "general health" of a married woman requires the use of contraceptives, and said (p. 418), "Therefore there is no occasion to determine whether an implied exception might be recognized when 'pregnancy would jeopardize life' similar to that usually expressly made in statutes concerning abortion."

We are now called upon to decide that issue. The plaintiff, a licensed physician, brought the present action for a judgment declaring whether the designated statutes make it unlawful for him to prescribe the use of contraceptive devices for married women, living

with their husbands, who come to him as patients in cases in which his professional judgment dictates that such treatment be given: (a) where a patient is suffering from high blood pressure so that if pregnancy occurred there would be imminent danger of toxemia of pregnancy which would have a 25 per cent chance of killing her; (b) where the patient is suffering from an arrested case of tuberculosis of the lungs of an acute and treacherous type, so that if she should become pregnant such condition would be likely to light up the disease and set back her recovery for several years, and might result in her death; (c) where the patient is in good health except in so far as she has been weakened by having had three pregnancies in about twenty-seven months and a new pregnancy would probably have a serious effect upon her general health and might result in permanent disability. Desiring to meet squarely the important issues involved, we have stated them in the very language used by the plaintiff in his brief, except that we have strengthened the third case and have pointed out more clearly than did the plaintiff that the patients are not now in danger as to life or health and in immediate need of medical or surgical treatment, as in abortion cases, but will be in such danger if they become pregnant.

Although the facts of the *Nelson* case involved the "general health" of the patient, and not health affected by a specific disease or condition, the reasoning of the opinion, and particularly the authorities cited, control the instant case and reject the claims now made by the plaintiff. Two judges dissented in the *Nelson* case, but it became the law of this state, and a change in the personnel of the court affords no ground for reopening a question which has been authoritatively settled. However, we consider the present case strictly upon its own factual situations and determine whether the

statutes in question permit the plaintiff to prescribe drugs, medicinal articles or instruments to prevent the pregnancy of patients whose condition, due to specific disease, is such that pregnancy, if it occurs, may result in death or serious injury to health.

The plaintiff's first claim is that § 6246, supra, was originally enacted in 1879 as part of a statute which was a law against obscenity only, and therefore had no reference to the medical situation now before us. It is sufficient to point out that it contained three prohibitions. One, it is true, was directed against obscene pictures and literature, but the second forbade the use of any drug, medicine, article, or instrument whatsoever for the purpose of preventing conception, and the third, the use of such articles for the purpose of causing unlawful abortion. Obviously, the latter two stamp the statute as having far wider scope than general obscenity. The argument then proceeds to contend that the legislative history of the statute since its enactment in 1879 is of no significance. We discussed and rejected this claim in the *Nelson* case (p. 417), where we considered in detail the repeated and recent refusals of the legislature to inject an exception. It is necessary to add only that since the decision a so-called medical birth control bill failed of enactment in the 1941 General Assembly. The result of all the attempts made to secure a change in these statutes is that no change whatsoever was made by the legislature. This is significant, for in the consideration of these bills year after year there was ample opportunity for the legislature to accept a compromise measure. It might have adopted a partial exception, as for instance, in cases where life might be in jeopardy if pregnancy occurred. Its refusal to make any change, in the light of its opportunity to do so, impels us to the conclusion that not even in such situations as are presented in the

instant case did the legislature wish to permit exceptions. It is not our function to doubt the wisdom of these statutes or question their propriety. The manifest intention of the legislature of this state, to date, for all-out prohibition cannot very well be denied. For us now to construe these plainly worded statutes as inapplicable to physicians, even under the limited circumstances of this case, would be to write into the statutes what is not there and what the legislature has thus far refused to place there.

The next claim of the plaintiff is that the decision in the *Nelson* case is not inconsistent with the claims of this plaintiff. We have stated above our view of the significance of this case. It is also claimed that the weight of authority in other jurisdictions supports the plaintiff's position. The only cases cited in the plaintiff's behalf are decisions of federal district or circuit courts. The applicable ones are discussed and distinguished in the *Nelson* case and in the Massachusetts case which we later refer to. We have again reviewed the federal cases and find no sound reason for holding that they control the present situation. A case principally relied upon by the plaintiff is *United States* v. *One Package,* 86 Fed. (2d) 737. It concerned § 305 (a) of the Tariff Act of 1930 (19 U.S.C.A. § 1305[a]) which provides that "All persons are prohibited from importing into the United States from any foreign country . . . any article whatever for the prevention of conception or for causing unlawful abortion." The question was (p. 738) "whether physicians who import such articles as those involved in the present case in order to use them for the health of their patients are excepted by implication from the literal terms of the statute." Judge Augustus N. Hand's opinion was careful to point out that the accused was a New York physician, that New York law, which makes it in

general a misdemeanor to sell or give away any articles for the prevention of conception, excepts furnishing such articles to physicians who may in good faith prescribe their use for the cure or prevention of disease, and that it was conceded that the use of contraceptives was in many cases necessary for the health of women. We point out also that the decision reads into the statute an exception in behalf of physicians who might intelligently employ such articles for the promotion of the well-being of their patients, and that this is directly contrary to our holding in the *Nelson* case. Judge Learned Hand, in a brief concurring opinion, says (p. 740): "Many people have changed their minds about such matters in sixty years, but the act forbids the same conduct now as then; a statute stands until public feeling gets enough momentum to change it, which may be long after a majority would repeal it, if a poll were taken. Nevertheless, I am not prepared to dissent." The opinions contain no record of repeated but unsuccessful attempts to change the statute, as in Connecticut.

The plaintiff's final claim is that if § 6246, supra, should be construed according to its express language it would violate the state and federal constitutions. As we shall point out in our discussion of the *Gardner* case, infra, the Supreme Court of the United States has held to the contrary.

In *Commonwealth* v. *Gardner*, 300 Mass. 372, 15 N. E. (2d) 222, in an opinion written by Chief Justice Rugg, the court unanimously decided that it could not read into a similar statutory prohibition any exception permitting the prescription in good faith by physicians of contraceptives. The claim there made by the defendants was precisely the same as that made by the plaintiff in the instant case, that the statute does not apply to drugs, medicines, instruments or articles for

the prevention of conception when they are intended for such use only upon prescription by a duly licensed physician for the preservation of life or health according to sound and generally accepted medical practices; and that, otherwise, the statute is unconstitutional under both the state and federal constitutions. The court said in substance that the terms of the statute are plain, unequivocal and peremptory, and contain no exceptions; that the statute was originally enacted in 1879 (as was ours) and that under the police power the legislature, without any denial of rights under either the state or the federal constitution, might take the view that the use of contraceptives would not only promote sexual immorality but would expose the commonwealth to other grave dangers; and that prevention of conception by medical advice and treatment was not unknown in 1879 and might have been the subject of an exception from the general legislative prohibition if the legislature had deemed such an exception consonant with public policy, but that it had equal power to adopt the contrary view that such an exception would endanger the effectiveness of the statute. It said that, if any exception to the broad prohibition enacted had been intended, it would have been easy to give expression to it in the statute, as was done by the legislature in the state of New York. It reviewed applicable rules of law—that in some cases the letter of a statute may be restrained by an equitable construction, in others enlarged, and in others the construction may be even contrary to the letter—but concluded that none of these principles applied, in view of the language and history of the statute and the circumstances of the case. The court also reviewed existing American authority. The opinion concludes: "The relief here urged must be sought from the law-

making department and not from the judicial department."

An attempt was made to have the decision in the *Gardner* case reviewed by the Supreme Court of the United States, but the defendants' appeals were summarily dismissed "for the want of a substantial federal question." (305 U. S. 559, 59 Sup. Ct. 90).

The plaintiff concedes, as he must, that the *Gardner* case is directly in point, but disapproves it, and claims that its force has been weakened by a later Massachusetts case, *Commonwealth* v. *Corbett*, 307 Mass. 7, 29 N. E. (2d) 151. This very recent case directly approved the *Gardner* decision. The prosecution failed because it had not been proven that the article in question was to be used "for the prevention of conception."

The sweeping decision of the Massachusetts court is believed by the plaintiff to be harsh and unreasonable. In the instant case the state urges a consideration not stated in the Massachusetts opinion. The prescription of contraceptives is not the only method open to the physician for preventing conception. He knows that intercourse would very likely result in pregnancy which might bring about the death of the patients. His problem is to advise them how to prevent conception. The common denominator of the opinions of the various medical authorities, made a part of the record, is the professional opinion that the safest medical treatment which could be prescribed for these patients would be to inform them of proper methods of preventing conception by means of drugs, medicinal articles and instruments which can be used by them safely and effectively to prevent conception and avert the unfortunate consequences which would flow from pregnancy. The sincere and well-reasoned opinion of all these authorities is that the use of contraceptives is

the safest medical treatment for bringing about the desired and necessary result. The state claims that there is another method, positive and certain in result. It is abstention from intercourse in the broadest sense —that is, absolute abstention. If there is one remedy, reasonable, efficacious and practicable, it cannot fairly be said that the failure of the legislature to include another reasonable remedy is so absurd or unreasonable that it must be presumed to have intended the other remedy also. The claim of the state on this point comes down, then, to a consideration of whether abstinence from intercourse is a reasonable and practicable method of preventing the unfortunate consequences. Certainly it is a sure remedy. Do the frailties of human nature and the uncertainties of human passions render it impracticable? That is a question for the legislature, and we cannot say it could not believe that the husband and wife would and should refrain when they both knew that intercourse would very likely result in a pregnancy which might bring about the death of the wife.

The legislature is the final forum. When the law it enacts comes to the courts, an implied limitation upon the operation of the statute may only be made in recognition of long existing and generally accepted rights (*Kelley* v. *Killourey*, 81 Conn. 320, 322, 70 Atl. 1031) or to avoid consequences so absurd or unreasonable that the legislature must be presumed not to have intended them. *State* v. *Nelson,* supra, 417; *Dorman* v. *Carlson,* 106 Conn. 200, 203, 137 Atl. 749; *Jacobson* v. *Massachusetts,* 197 U. S. 11, 39, 25 Sup. Ct. 358. The legislative history of § 6246, among other considerations, distinguishes the instant case from *New Haven Savings Bank* v. *Warner,* 128 Conn. 662, 25 Atl. (2d) 50.

The plaintiff relies upon a vaccination case. In

*Jacobson* v. *Massachusetts,* supra, the Supreme Court of the United States upheld the constitutionality of a compulsory vaccination statute, but pointed out that there was nothing in the evidence to indicate that vaccination would in any way harm the plaintiff, and that the court was not inclined to hold that the statute establishes the absolute rule that an adult must be vaccinated if it be apparent or can be shown with reasonable certainty that he is not at the time a fit subject for vaccination or that vaccination by reason of his then condition would seriously impair his health or probably cause his death. A similar situation is presented in abortion cases where the patient is in such condition that to allow pregnancy to continue would result in death. It has been intimated that such an exception exists although the statute does not express it. *State* v. *Rudman,* 126 Me. 177, 136 Atl. 817; 1 C. J. S. 322, § 13. In such cases, unless an exception was read into the statute, there was no alternative. The choice was either exception or injury. In the instant case there is an alternative which the legislature was entitled to believe was reasonable and practicable, and we are not permitted to read an exception into the statute. In New York there is such an exception, but it is expressed in the statute itself and is carefully limited and defined. New York Penal Law, § 1145.

An outstanding factor throughout the controversy in this court over these statutes is that, although our legislature has repeatedly refused to amend the law, we have been asked, by construction, to accomplish the purpose which it declined to sanction. It is the legislature which must determine the requirements of public policy for the state and, if the legislature is of the opinion that the broad provisions of these statutes should stand unchanged, for us to read an exception

into them is to pre-empt the legislative function. We may do so only under the circumstances we have already stated; otherwise, we go outside the proper scope of the judicial function as it exists under our form of government. The only basis upon which an exception can be read into the statutes is that the legislature, despite the broad terms of the law, could not have intended that they apply in a certain situation. The legislature has, by its refusal to amend the statutes, indicated beyond doubt its intention that they should apply as they are written, without the exception claimed by the plaintiff. The claim that when the legislature originally enacted this law in 1879 it did not intend that it should apply to the present situation, even if true, would not be controlling, because the law has been re-enacted repeatedly in the various revisions and it stands before us as a law which was approved by the legislature as late as the most recent revision, that of 1930.

We say again that the courts are permitted to pass only upon the legal questions involved. When the legislature expresses the will of the people in a statutory enactment the language of which is plain and unambiguous, the law must stand unless it is clearly unconstitutional or unless it is plain that the legislature must have intended an exception which it did not express. Birth control is a highly controversial subject. Social thinking is divergent. It finds frequent expression at legislative hearings. Then the legislature speaks. In the statutes now under consideration it has infringed upon what a large body of intelligent citizens believe are their natural rights and privileges. The answer is that "'The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority . . . essential to the safety, health, peace, good order and morals of

the community.'" The Supreme Court of the United States in *Jacobson* v. *Massachusetts,* supra, 26.

The argument presented to the legislature is moral, physiological, sociological. The questions presented to us in this case are wholly legal; we believe they are not very difficult.

In order to decide the broad questions involved we have been willing to assume but not to decide that an action for a declaratory judgment is a proper procedure. We must, however, point out certain difficulties attendant upon its use in this case. Two separate statutes are necessarily involved. Section 6246 penalizes "any person who shall use any drug, medicinal article or instrument for the purpose of preventing conception." Section 6562 provides a penalty for "any person who shall assist, abet, counsel, cause, hire or command another to commit any offense." The plaintiff specifically asks that he as a physician, under certain limited circumstances, be allowed to prescribe contraceptives. If we read this exception into § 6562, the other statute, § 6246, still stands, and prohibits any person from using them. If we read it into § 6246, or if we read it into the sections together, we allow the exception for persons in a very different situation from that of the plaintiff. The real difficulty, however, is that if, under the restricted conditions proposed, doctors are to be permitted to prescribe contraceptives by the process of reading an exception into the statutes, the limitations would be wholly ineffective unless implemented by further provisions as regards their use, and particularly their sale, such as a requirement that no druggist should sell them except upon a written order of a licensed physician, and perhaps with the requirement, as in the case of narcotics, that the prescriptions be kept on file. No such restrictions can be imposed by any judicial decision we can make.

All questions propounded in the stipulation for reservation are answered, expressly or by implication, by saying that §§ 6246 and 6562 of the General Statutes prohibit the action proposed to be done by the plaintiff under the circumstances disclosed by the first, second and third counts of the complaint; and that these statutes are constitutional.

No costs will be taxed in this court.

In this opinion MALTBIE, C. J., and BROWN, J., concurred.

AVERY, J. (dissenting). In the case of *State* v. *Nelson,* 126 Conn. 412, 11 Atl. (2d) 856, it was held by a majority of this court that the sections of the General Statutes above referred to should be so construed as to prohibit a duly licensed physician from prescribing the use of contraceptive devices to a married woman when, in the opinion of the physician, the general health and well-being of the patient necessitates it. In that case it was held (p. 418) that there was "no occasion to determine whether an implied exception might be recognized when 'pregnancy would jeopardize life' similar to that usually expressly made in statutes concerning abortion."

The decision in the *Nelson* case is based principally upon the opinion of the Supreme Judicial Court of Massachusetts in *Commonwealth* v. *Gardner,* 300 Mass. 372, 376, 15 N. E. (2d) 222, where that court refused to read into a similar statutory prohibition any exception permitting the prescription in good faith by physicians of contraceptives, even for the preservation of life. Our court also considered significant the fact that attempts had been made in our legislature to amend these statutes in various sessions since 1923, without success.

In construing a statute, the cardinal principle of construction is to ascertain the intent of the legislature. If an act passed by the legislature is within its constitutional power, it is not the business of the court to attempt to twist the interpretation of the law to conform to the ideas of the judges as to what the law ought to be or to attempt to make the law coincide with their ideas of social justice. The judicial function should not invade the province of the legislature. In its endeavor to ascertain the legislative intent, the court in construing the meaning of the law takes into consideration not only the language of the law but the circumstances existing when the law was made by the legislature and the purpose sought to be accomplished by it. Where circumstances have arisen not within the contemplation of the legislature when a law was passed so that a literal interpretation of the statute would work a result not contemplated or intended by the legislature which enacted it, courts have frequently recognized implied exceptions to legislative acts. "The letter of a law is not in all cases a correct guide to the true sense of the lawmaker. Statutes general in their terms are frequently construed to admit implied exceptions." *Kelley* v. *Killourey*, 81 Conn. 320, 321, 70 Atl. 1031. "General terms descriptive of a class of persons made subject to a criminal statute may and should be limited where the literal application of the statute would lead to extreme or absurd results, and where the legislative purpose gathered from the whole Act would be satisfied by a more limited interpretation." *United States* v. *Katz*, 271 U. S. 354, 362, 46 Sup. Ct. 513. "To construe statutes so as to avoid absurd or glaringly unjust results, foreign to the legislative purpose, is . . . a traditional and appropriate function of the courts. Judicial nullification of statutes, admittedly valid and applicable, has, happily, no

place in our system. The Congress by legislation can always, if it desires, alter the effect of judicial construction of statutes." *Sorrells* v. *United States*, 287 U. S. 435, 450, 53 Sup. Ct. 210. This principle has been recently recognized in this state in the case of *New Haven Savings Bank* v. *Warner*, 128 Conn. 662, 668, 25 Atl. (2d) 50. We held that General Statutes, § 4929, directing commissioners on insolvent estates to inquire into and report to the court the cash value of any security which a creditor of such an estate may have for his claim, did not apply to commissioners on solvent estates, notwithstanding the provision of General Statutes, § 4920, that commissioners on solvent estates shall have "all the powers and duties" concerning such a claim appertaining to commissioners appointed upon insolvent estates.

General Statutes, § 6246, was passed as Chapter 78 of the Public Acts of 1879. It was entitled "An Act to Amend an Act concerning Offences against Decency, Morality, and Humanity." It provided: "Every person who shall sell, or lend, or introduce into any family, college, academy, or school, or shall have in their possession, for any such unlawful purpose or purposes, any obscene, lewd, or lascivious book, pamphlet, paper, picture, print, drawing, figure, or image, or other publication of an indecent nature, or who shall manufacture, sell, advertise for sale, or have in their possession, for any such unlawful purpose or purposes, any article, thing, or instrument designed, or intended and adapted for, any indecent and immoral use, purpose, or nature or use any drug, medicine, article, or instrument whatsoever, for the purpose of preventing conception, or causing unlawful abortion, shall be fined," etc. Prior to this amendment, the statute read: "Every person, who shall purchase or introduce into any family, college, academy or school,

any printed or engraved matter containing obscene language, prints, or descriptions, or any drawing or figure of an obscene character, shall be fined. . . ." General Statutes, 1875, p. 513, Tit. 20, Chap. 8, § 4. The act of 1879 followed very closely in its language the Comstock Act, passed by Congress in 1873. 17 Statutes at Large 598, Chap. 258; Dennett, Birth Control Laws, p. 19. Both the federal and the state acts were passed principally for the purpose of preventing obscenity and the dissemination of obscene and lewd literature. In the revision of our General Statutes in 1888, the obscenity law was broken up into several sections, and the section of the statute dealing with contraceptives was made into a separate section. General Statutes, 1888, § 1539.

There was no judicial interpretation of this statute in this state until the *Nelson* case in 1940, sixty-one years after its enactment. The fact that the legislature on various occasions refused to amend the statute is of no significance as to what was meant by it when it was adopted in 1879. "The legislature cannot authoritatively declare what the law is or has been; that is a judicial function and appertains to the courts." Lewis' Sutherland, Statutory Construction (2d Ed.), § 358. But, even if it be conceded that some weight should be given to the action of the legislature in refusing to expressly amend the statute since 1923, it might as plausibly be argued that its refusal indicated its belief that no amendment was necessary and that the act was not intended to and did not apply to physicians. *State* v. *Kemp*, 126 Conn. 60, 66, 9 Atl. (2d) 63; *State* v. *Hayes*, 127 Conn. 543, 578, 18 Atl. (2d) 895. Abortion statutes, although general in their terms, have been held not to prevent physicians from performing such operations when necessary to preserve the life of the mother. *Commonwealth* v. *Sholes*, 13 Allen (95

Mass.) 554, 558; *State* v. *Rudman,* 126 Me. 177, 181, 136 Atl. 817. "Though the letter of the statute would cover all acts of abortion, the rule of giving a reasonable construction in view of the disclosed national purpose would exclude those acts that are in the interest of the national life. Therefore a physician may lawfully use the mails to say that if an examination shows the necessity of an operation to save life he will operate, if such in truth is his real position." *Bours* v. *United States,* 229 Fed. 960, 964, 144 C. C. A. 242.

In the federal courts, medical books and treatises are not considered as obscene matter, although they might fall literally within the definition of the law. *United States* v. *Dennett,* 39 Fed. (2d) 564, 568; *United States* v. *One Obscene Book Entitled "Married Love,"* 48 Fed. (2d) 821, 823; *United States* v. *One Book Entitled "Contraception,"* 51 Fed. (2d) 525, 527. The federal courts have also uniformly held that contraceptives used for medical purposes did not come within the purview of statutes prohibiting their importation or distribution through the mails. *Youngs Rubber Corporation* v. *C. I. Lee & Co.,* 45 Fed. (2d) 103, 108; *Davis* v. *United States,* 62 Fed. (2d) 473, 475. In the unreported case of *United States* v. *Belaval* (U. S. District Court, Puerto Rico, 1939), it was held that the federal Comstock Act, as applied to the territories of the United States or the District of Columbia, did not prohibit the use of contraceptives when prescribed by physicians for patients suffering from diseases which, in the judgment of the physicians, might make it not only humane to prescribe such devices but necessary to their lives.

In *United States* v. *One Package,* 86 Fed. (2d) 737, 739, the question before the court was whether the importation by a physician of certain devices for pre-

venting conception violated the provisions of the Tariff Act of 1930, 19 U. S. C. A. § 1305(a). In the opinion of the Circuit Court of Appeals, delivered by Augustus N. Hand, it was said: "It is true that in 1873, when the Comstock Act was passed, information now available as to the evils resulting in many cases from conception was most limited, and accordingly it is argued that the language prohibiting the sale or mailing of contraceptives should be taken literally and that Congress intended to bar the use of such articles completely. While we may assume that section 305(a) of the Tariff Act of 1930 (19 U. S. C. A. § 1305[a]) exempts only such articles as the act of 1873 excepted, yet we are satisfied that this statute, as well as all the acts we have referred to, embraced only such articles as Congress would have denounced as immoral if it had understood all the conditions under which they were to be used. Its design, in our opinion, was not to prevent the importation, sale, or carriage by mail of things which might intelligently be employed by conscientious and competent physicians for the purpose of saving life or promoting the well being of their patients. The word 'unlawful' would make this clear as to articles for producing abortion, and the courts have read an exemption into the act covering such articles even where the word 'unlawful' is not used. The same exception should apply to articles for preventing conception. While it is true that the policy of Congress has been to forbid the use of contraceptives altogether if the only purpose of using them be to prevent conception in cases where it would not be injurious to the welfare of the patient or her offspring, it is going far beyond such a policy to hold that abortions, which destroy incipient life, may be allowed in proper cases, and yet that no measures may be taken to prevent conception even though a likely result

should be to require the termination of pregnancy by means of an operation. It seems unreasonable to suppose that the national scheme of legislation involves such inconsistencies and requires the complete suppression of articles, the use of which in many cases is advocated by such a weight of authority in the medical world.

"The Comstock Bill, as originally introduced in the Senate, contained the words 'except on a prescription of a physician in good standing, given in good faith,' but those words were omitted from the bill as it was ultimately passed. The reason for amendment seems never to have been discussed on the floor of Congress, or in committee, and the remarks of Senator Conklin, when the bill was up for passage in final form, indicate that the scope of the measure was not well understood and that the language used was to be left largely for future interpretation. We see no ground for holding that the construction placed upon similar language in the decisions we have referred to is not applicable to the articles which the government seeks to forfeit, and common sense would seem to require a like interpretation in the case at bar."

The argument is advanced by the state that in no case is it necessary to prescribe contraceptives in order to save the life of the patient. It is argued that in all cases it is possible for a married woman to avoid conception by a policy of continence and abstention from marital intercourse. Even if it be conceded that such a course of conduct is reasonably practicable, taking into consideration the propensities of human nature, the resort to such a practice would frustrate a fundamental of the marriage state. The alternative suggested in the argument of the state against permitting qualified physicians to give proper medical advice upon this subject would tend in many cases to cause un-

happiness and discontent between parties lawfully married, would stimulate unlawful intercourse, promote prostitution, and increase divorce. According to the theory of the state, it is not lawful for a physician to prescribe articles so as to prevent conception, in the case of married women whose health will not permit them to bear children; but it is lawful in case such women do become pregnant to perform abortions upon them when necessary to preserve their lives. It is difficult to believe that the legislature in 1879, in passing the present statute as part of an act concerning offenses against decency, morality, and humanity, contemplated such a situation or that the law would be given such a construction. A proper respect for the legislature forbids an interpretation which would work such a result and be so contrary to human nature. A reasonable construction of the statute, considering its history and the circumstance under which it was enacted, requires that it be so interpreted as to permit duly licensed physicians to prescribe to married women contraceptive devices and information necessary to prevent conception when in the judgment of the physician conception would imperil the life or health of the patient. In the Massachusetts case of *Commonwealth* v. *Gardner*, supra, the federal cases are referred to and brushed aside as either distinguishable or not persuasive. In *State* v. *Nelson*, supra, 419, the same position was taken by the majority of this court, but in neither of these cases is any reason given why the arguments advanced in the federal cases are not convincing or why an interpretation should be given to a law passed in 1879 which the legislators at that time did not think of or allude to.

The case of *Commonwealth* v. *Gardner* was not only contrary to the position taken by the federal courts but in its practical application has been greatly weak-

ened by the subsequent decisions in *Commonwealth* **v.** *Corbett,* 307 Mass. 7, 29 N. E. (2d) 151, and *Commonwealth* v. *Werlinsky,* 307 Mass. 608, 29 N. E. (2d) 150. While in the *Gardner* case the Massachusetts court held (p. 375) that their statute provided "absolute and unconditional prohibition against the sale, gift, or loan of contraceptive drugs, medicines, or articles for that end," in the later cases it was held that notwithstanding the absolute prohibition in the language of the statute the seller of an article which could be used to prevent conception but also could be used to prevent the spread of venereal disease could not be convicted under the Massachusetts statute without proof that in selling the article he sold it with the intent that it be used to prevent conception. By these later decisions, the Supreme Court of Massachusetts not only read an exception into their statute not recognized in the *Gardner* case but did this in such a manner as to render the statute as a practical matter wholly nugatory so far as preventing the sale of certain kinds of contraceptive devices is concerned. It is difficult to understand that the legislature of Massachusetts intended to authorize the indiscriminate sale of the filthy devices described in the *Corbett* case and at the same time intended to prohibit licensed physicians from giving advice in regard to the use of contraceptives to married women when such advice was required to conserve the life or health of their patients.

The majority take the position that if the physician gave the patient information upon this subject it would violate General Statutes, § 6246, for the patient to avail herself of the information and use the articles prescribed. In advancing this opinion, the majority is attempting to decide a case not before us. No authority is given for its position. If the case were before us for decision, it is believed that what the physician may

lawfully prescribe the patient may lawfully use and that the exception which should be made to the statute in the case of the physician should also be made in the case of the patient acting upon the advice of the physician.

The majority also state that the patient could not obtain the requisite drugs and appliances because their sale is unlawful. It is agreed by the parties in the stipulation that if the plaintiff physician may lawfully do so he "will cause to be procured and delivered to said patients such drugs, articles and instruments, and will as a physician instruct, or cause them to be instructed, how to use the same in a safe, sanitary and effective manner." The majority also overlook the fact that the manufacture of such articles is quite general [1] and that they may be transmitted by mail to physicians for their lawful use. *Davis* v. *United States*, 62 Fed. (2d) 473, 475.

It follows that as to all the cases specified in the reservation the answer should be that the physician may lawfully give such advice so far as in his professional judgment it is required in the interest of the life or health of the patient.

In this opinion JENNINGS, J., concurred.

---

[1] An order of the War Production Board dated January 24, 1942, (List C to Supplementary Order No. M-15-b as amended) permits contraceptives both for men and women to be manufactured at 100 per cent of the 1940-41 production level despite drastic curtailment of the use of rubber for many other civilian needs.