******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., dissenting. " 'Twill be recorded for a precedent, And many an error by the same example Will rush into the state." W. Shakespeare, The Merchant of Venice, act IV, sc. i.

I write this dissenting opinion not to address the concurring opinion of Justice Palmer, who continues to believe that *State* v. *Santiago*, 318 Conn. 1, 122 A.3d 1 (2015), was rightly decided.[1] I have already addressed the merits of *Santiago*, or rather, the lack thereof, in my dissenting opinion in that case. Id., 388. Of course, my dissenting opinion in *Santiago* pales in comparison to the dissent issued by Chief Justice Rogers, who wrote that "[e]very step" of the majority's analysis in that decision was "fundamentally flawed"; id., 231; and then, over the course of 110 blistering pages, painstakingly and methodically exposed those flaws one by one, ripping the majority's all too vulnerable analysis to shreds, revealing it to be both a violation of the principle of stare decisis; id., 238; and so lacking in foundation that it was built upon "a house of cards, falling under the slightest breath of scrutiny." Id., 233. Accordingly, I refer any readers who retain doubts as to whether *Santiago* was clearly wrong to the dissenting opinion of the Chief Justice. Id., 231–341.

I also need not address the barely two paragraph disdainful majority opinion in the present case. I do note, however, that it is hardly surprising that the majority has decided to issue its opinion as a terse and dismissive per curiam, suggesting that the state's arguments in favor of overruling *Santiago* do not merit serious consideration. This is particularly troubling considering the importance of the issue presented in this appeal. It is this court's duty to give full consideration to the claims of the parties who come before it. In many cases less significant than the present one, the court as a matter of courtesy and respect answers all the claims raised by the parties, even when the court may believe that such claims lack merit. Dismissing the state's arguments in the present case in a *per curiam* opinion creates the appearance that the outcome was predisposed, and that oral argument was allowed merely to avoid the perception that the state was being treated unfairly. Indeed, Mark Rademacher, the assistant public defender who argued this appeal, stated that the purpose of granting the state's motion for oral argument was " '[to make] the state feel good about losing.' " J. Charlton, "Connecticut High Court Revisits Death Penalty," Fox 61, January 7, 2016, available at http://fox61.com/2016/01/07/Connecticut-high-court-to-revisit-death-penalty/ (last visited May 16, 2016).

I write to address the concurring opinion of the Chief Justice who frames the issue presented in this appeal

in this manner: May the court overrule a recently established precedent solely because there has been a panel change since the now challenged decision? Taking that as her starting point, the Chief Justice voices the concern that overruling *Santiago* would call into question the integrity of this court because doing so: (1) would create the appearance that the court is governed by the whims of individual justices rather than the rule of law; (2) would create the public perception that the result of a case depends on the composition of the panel; and (3) would undermine the stability and predictability of the law, on which litigants rely. The short answer to those concerns is that they are unjustified and irrelevant when the prior precedent at issue is clearly wrong. As I explain in this dissenting opinion, this is particularly true when the clearly wrong, recently decided case has violated the doctrine of stare decisis—under those circumstances, that doctrine *requires* that the prior precedent be overruled. *Adarand Constructors, Inc.* v. *Pena*, 515 U.S. 200, 233–34, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995). The position of the Chief Justice in the present case, therefore, is irreconcilable with her position in her dissenting opinion in *Santiago*, that the decision was clearly wrong. See *State* v. *Santiago*, supra, 318 Conn. 231. A panel change cannot insulate a clearly wrong decision from being overruled.[2]

Because of the importance of the issue presented in this appeal, a longer response is necessary. This court's appearance as an impartial decision-making body, governed by the rule of law rather than the proclivities of individual panel members, is vital. No one disputes that, nor does anyone question the integral role that stability and predictability play in our legal system. But the protestations of the Chief Justice are predicated on a straw man that employs post hoc reasoning and finds no support in our stare decisis jurisprudence. In this dissent, I consider these two flaws in the analysis of the Chief Justice, and thereby illustrate the central flaw in her opinion—it overlooks the overarching stare decisis principle of which even playwrights are aware—a clearly wrong decision is dangerous, because it will be relied on as precedent. As this court frequently has noted, "[i]t is more important that the court should be right upon later and more elaborate consideration of the cases than consistent with previous declarations." (Internal quotation marks omitted.) *Conway* v. *Wilton*, 238 Conn. 653, 660, 680 A.2d 242 (1996). And when a decision is so clearly wrong that the Chief Justice felt compelled to write in her dissent that the "fundamentally flawed" analysis suffers from a "complete absence of any historical support," relies on "irrelevant" factors; *State* v. *Santiago*, supra, 318 Conn. 231; is so "riddled with non sequiturs . . . [that] to enumerate all of them would greatly and unnecessarily increase the length of this [110 page] dissenting opinion," engages in "speculation" and relies on propositions that are "devoid of any

substantive content"; id., 242–43; "misstates both the eighth amendment jurisprudence of the United States Supreme Court and the state constitutional jurisprudence of this court"; id., 249; is "untenable"; id., 254; "illogical"; id., 256; "troubling"; id., 257; and "deliberately vague"; id., 261; is predicated on a legislative history that was created by "cherry pick[ing] extra-record sources that provide slanted and untested explanations for the history of the death penalty in this state"; id., 264 n.30; and constitutes a "judicial invalidation, without constitutional basis, of the political will of the people"; id., 278; that decision, which itself violated the doctrine of stare decisis, does not merit the application of that doctrine.

I

POST HOC STRAW MEN ARE UNPERSUASIVE

The Chief Justice misstates the issue presented in this appeal, framing it as whether this court should overrule a recently decided case *because* the panel has subsequently changed. By formulating the issue in that manner, she erects a straw man. Obviously, if this court were to overrule a decision merely *because* the panel had changed, the court would do damage to the rule of law. That causal connection exists, however, only in the opinion of the Chief Justice, who certainly finds herself more than capable of knocking down the proposition she has put forward. But the mere fact that a decision overruling *Santiago* would have occurred after the panel changed does not necessitate the conclusion that the panel change would have *caused* the court to overrule *Santiago*, and is nothing more than a logical fallacy, an example of "post hoc, ergo propter hoc"[3] reasoning.

On another level, what the Chief Justice appears to suggest is that, because the panel in *Santiago* would have been unwilling to overrule that decision, the current panel is prevented from doing so. She even goes so far as to tally the unchanged votes of the remaining three members of the majority panel from *Santiago* that are on the panel for this appeal, counting that as support for her decision to accord stare decisis effect to *Santiago*. She appears to suggest, therefore, that if one of the members of the majority in *Santiago* had come to the realization that *Santiago* was clearly wrong, a majority of the panel in the present case would be justified in overruling *Santiago*. First, if that notion does not create the appearance that the personally held beliefs of individual justices govern the outcome of the present appeal, I do not know what would. Second, the Chief Justice does not give her own vote, or the votes of the other two original dissenting justices, sufficient weight. By my tally, those votes also totaled three. Finally, if the notion advanced by the Chief Justice— that an opinion should not be overruled because the original majority continued to believe the case was

rightly decided—held any weight, *Plessy* v. *Ferguson*, 163 U.S. 537, 16 S. Ct. 1138, 41 L. Ed. 256 (1896), overruled by *Brown* v. *Board of Education*, 347 U.S. 483, 494–95, 74 S. Ct. 686, 98 L. Ed. 873 (1954), would still be good law.

## II

### STARE DECISIS PRINCIPLES APPLIED TO A DECISION THAT FLOUTED STARE DECISIS

This court has stated that "[one] well recognized exception to stare decisis under which a court will examine and overrule a prior decision . . . [is when that prior decision] is clearly wrong." (Internal quotation marks omitted.) *Conway* v. *Wilton*, supra, 238 Conn. 660. The exception to the doctrine of stare decisis for decisions that are "clearly wrong" is perhaps the oldest and most well established, dating back to William Blackstone, who explained: "[I]t is an established rule to abide by former precedents, where the same points come again in litigation . . . . Yet this rule admits of exception, where the former determination is *most evidently contrary to reason*; much more if it be contrary to the divine law. . . . The doctrine of the law then is this: that precedents and rules must be followed, *unless flatly absurd* or unjust: for though their reason be not obvious at first view, yet we owe such a deference to former times as not to suppose they acted wholly without consideration." (Emphasis added.) 1 W. Blackstone, Commentaries on the Laws of England (1775) pp. 69–70.

Contrary to the position of the Chief Justice, the United States Supreme Court has held that when a recently decided case has ignored and contravened existing precedent, the doctrine of stare decisis *requires* that the decision be overruled. As explained by D. Arthur Kelsey, now a justice of the Supreme Court of Virginia, when "a court overrules a more recent case that, itself, violated stare decisis and thus represented a divergence from settled precedent . . . the court does not flout stare decisis by overruling the anomalous case. Rather, it 'restore[s]' the prior 'fabric of [the] law' that the anomalous case departed from. *Adarand Constructors, Inc.* v. *Pena*, [supra, 515 U.S. 234]. Thus, in *Adarand Constructors, Inc.*, the [c]ourt overruled its recent opinion in [*Metro Broadcasting, Inc.* v. *Federal Communications Commission*, 497 U.S. 547, 110 S. Ct. 2997, 111 L. Ed. 2d 445 (1990)], stating: '*Metro Broadcasting* [*Inc.*] itself departed from our prior cases— and did so quite recently. By refusing to follow *Metro Broadcasting* [*Inc.*], then, we do not depart from the fabric of the law; we restore it.' " D. Kelsey, "The Architecture of Judicial Power: Appellate Review and Stare Decisis," 45 Judges' J., p. 13 n.29 (Spring 2006).

I observe that there were significant panel changes in the five years that passed between *Metro Broadcasting, Inc.*, and *Adarand Constructors, Inc.* The majority in

*Metro Broadcasting, Inc.*, was comprised of Justices Brennan, White, Marshall, Blackmun and Stevens. *Metro Broadcasting, Inc.* v. *Federal Communications Commission*, supra, 497 U.S. 550. The dissenters were Chief Justice Rehnquist, and Justices O'Connor, Scalia and Kennedy. Id. When the court overruled *Metro Broadcasting, Inc.*, in *Adarand Constructors, Inc.*, none of the original panel members changed their positions, but only Justice Stevens remained of the original majority. *Adarand Constructors, Inc.* v. *Pena*, supra, 515 U.S. 202–203. Writing for the majority in *Adarand Constructors, Inc.*, Justice O'Connor distinguished this context—when the court considers overruling a recent decision that contravened well established precedent— from the context presented in *Planned Parenthood of Southeastern Pennsylvania* v. *Casey*, 505 U.S. 833, 844, 864, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992), in which the court considered whether to overrule *Roe* v. *Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973). *Adarand Constructors, Inc.* v. *Pena*, supra, 233. When *Casey* was decided, *Roe* had become "integrated into the fabric of law." Id., 234. By contrast, *Metro Broadcasting, Inc.*, created a tear in that fabric by violating the principle of stare decisis; the doctrine therefore required that the damage be controlled by overruling the anomalous decision as soon as possible. Id., 233–34.

The United States Supreme Court relied on the very same principle in *United States* v. *Dixon*, 509 U.S. 688, 704, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993), in which it overruled its decision in *Grady* v. *Corbin*, 495 U.S. 508, 110 S. Ct. 2084, 109 L. Ed. 2d 548 (1990), following a panel change. The court in *Dixon* explained that "*Grady* contradicted an unbroken line of decisions, contained less than accurate historical analysis, and has produced confusion . . . ." (Internal quotation marks omitted.) *United States* v. *Dixon*, supra, 711. Letting that decision stand, therefore, would "mock stare decisis." Id., 712; see D. Kelsey, supra, 45 Judges' J., p. 13 n.29.

That is precisely the context in the present case. The Chief Justice detailed the manner in which the majority in *Santiago* cast aside a vast body of existing precedent, simply because the majority of the panel in that case held a contrary view, in complete contravention to applicable precedent and with flagrant disrespect for the principle of stare decisis. *State* v. *Santiago*, supra, 318 Conn. 238–39 (*Rogers*, C. J., dissenting). She observed that essential to the majority's analysis was its position that "this court's previous holdings that the due process provisions of the state constitution do not bar the imposition of the death penalty for the most heinous murders are now questionable . . . ." Id., 238 (*Rogers*, C. J., dissenting). She then criticized the majority, not only for its lack of respect for precedent, but also for its lack of intellectual honesty. She pointed out that the majority—unwilling to openly acknowledge the fact that it was overruling dozens of decisions, which

repeatedly had upheld the constitutionality of the death penalty, solely because the majority would have held a different view—"carefully avoid[ed] suggesting . . . [that those decisions] were wrongly decided." (Citation omitted.) Id., 238 n.5.

In fact, the Chief Justice's dissenting opinion in *Santiago* makes clear that the majority decision in that case was driven by naked judicial activism, in contravention to the existing law of this state. She explained: "[B]ecause there is no legitimate legal basis for finding the death penalty unconstitutional under either the federal or the state constitution, I can only conclude that the majority has improperly decided that the death penalty must be struck down because it offends the majority's subjective sense of morality." Id., 276–77. It was a classic example of a court giving no effect or even consideration to the principle of stare decisis, and represented a drastic departure from our death penalty jurisprudence. Inevitably, such decisions are, as the Chief Justice expressed eloquently, "based on a house of cards, falling under the slightest breath of scrutiny." Id., 233. In other words, such decisions inevitably are clearly wrong and destroy the fabric of the law. Stare decisis requires that such decisions be overruled.

In the present case, accordingly, the question is not whether the court should overrule *Santiago because of* a panel change. The question that the Chief Justice should be asking is whether stare decisis principles support the conclusion that a panel change *prevents* this court from being able to overrule a clearly wrong, recently decided case that constitutes an abrupt departure from well established precedent. And the clear answer to that question is no; stare decisis requires that the fabric of the law be restored by overruling the anomalous decision.

The Chief Justice cannot point to a single case to support the proposition that a panel change prevents the court from overruling clearly wrong precedent, because none exists. My research has revealed that all of this court's decisions overruling prior precedent have happened *following* a panel change. During her tenure, for instance, my research also has revealed that this court has overruled its prior precedent on at least *twenty-five occasions*. In every single one of those cases, the panel that overruled the prior precedent differed from the panel that had decided the original case. See *State* v. *Wright*, 320 Conn. 781, 810,     A.3d (2016) (overruling in part *State* v. *DeJesus*, 270 Conn. 826, 856 A.2d 345 [2004]); *Arras* v. *Regional School District No. 14*, 319 Conn. 245, 268–69 n.24, 125 A.3d 172 (2015) (overruling *Pollard* v. *Norwalk*, 108 Conn. 145, 142 A. 807 [1928], "to the extent that *Pollard* supports the dissent's position" in *Arras*, on basis that if dissent's reading of *Pollard* were correct, *Pollard* would be inconsistent with *Bortner* v. *Woodbridge*, 250 Conn.

241, 736 A.2d 104 [1999], and *Sadlowski* v. *Manchester*, 206 Conn. 579, 538 A.2d 1052 [1988]); *Campos* v. *Coleman*, 319 Conn. 36, 57, 123 A.3d 854 (2015) (overruling *Mendillo* v. *Board of Education*, 246 Conn. 456, 717 A.2d 1177 [1998]); *State* v. *Moreno-Hernandez*, 317 Conn. 292, 308, 118 A.3d 26 (2015) (overruling in part *State* v. *Gonzalez*, 222 Conn. 718, 609 A.2d 1003 [1992]); *Haynes* v. *Middletown*, 314 Conn. 303, 323, 101 A.3d 249 (2014) (overruling in part both *Purzycki* v. *Fairfield*, 244 Conn. 101, 708 A.2d 937 [1998], and *Burns* v. *Board of Education*, 228 Conn. 640, 638 A.2d 1 [1994]); *State* v. *Artis*, 314 Conn. 131, 156, 101 A.3d 915 (2014) (overruling *State* v. *Gordon*, 185 Conn. 402, 441 A.2d 119 [1981], cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 [1982]); *State* v. *Elson*, 311 Conn. 726, 746–48, 748 n.14, 754, 91 A.3d 862 (2014) (overruling in part *In re Jan Carlos D.*, 297 Conn. 16, 997 A.2d 471 [2010], *State* v. *Cutler*, 293 Conn. 303, 977 A.2d 209 [2009], *In re Melody L.*, 290 Conn. 131, 962 A.2d 81 [2009], *Johnson* v. *Commissioner of Correction*, 288 Conn. 53, 951 A.2d 520 [2008], *State* v. *McKenzie-Adams*, 281 Conn. 486, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 [2007], *State* v. *Commins*, 276 Conn. 503, 886 A.2d 824 [2005], *Lebron* v. *Commissioner of Correction*, 274 Conn. 507, 876 A.2d 1178 [2005], and *State* v. *Ramos*, 261 Conn. 156, 801 A.2d 788 [2002]); *Ulbrich* v. *Groth*, 310 Conn. 375, 409, 78 A.3d 76 (2013) (overruling in part *Flagg Energy Development Corp.* v. *General Motors Corp.*, 244 Conn. 126, 709 A.2d 1075 [1998]); *State* v. *Moulton*, 310 Conn. 337, 362 n.23, 363, 78 A.3d 55 (2013) (overruling "prior precedent to the contrary" of court's conclusion that "[General Statutes] § 53a-183 [a] proscribes harassing and alarming speech as well as conduct"); *State* v. *Polanco*, 308 Conn. 242, 245, 261, 61 A.3d 1084 (2013) (overruling in part *State* v. *Chicano*, 216 Conn. 699, 584 A.2d 425 [1990], cert. denied, 501 U.S. 1254, 111 S. Ct. 2899, 115 L. Ed. 2d 1062 [1991]); *State* v. *Sanchez*, 308 Conn. 64, 80, 60 A.3d 271 (2013) (overruling in part *Finley* v. *Aetna Life & Casualty Co.*, 202 Conn. 190, 520 A.2d 208 [1987], overruled in part on other grounds by *Curry* v. *Burns*, 225 Conn. 782, 786, 626 A.2d 719 [1993]); *State* v. *Guilbert*, 306 Conn. 218, 253, 49 A.3d 705 (2012) (overruling in part *State* v. *McClendon*, 248 Conn. 572, 730 A.2d 1107 [1999], and *State* v. *Kemp*, 199 Conn. 473, 507 A.2d 1387 [1986]); *State* v. *Paige*, 304 Conn. 426, 446, 40 A.3d 279 (2012) (overruling in part *State* v. *Greenberg*, 92 Conn. 657, 103 A. 897 [1918]); *Gross* v. *Rell*, 304 Conn. 234, 270–71, 40 A.3d 240 (2012) (overruling in part *Lesnewski* v. *Redvers*, 276 Conn. 526, 886 A.2d 1207 [2005]); *Arrowood Indemnity Co.* v. *King*, 304 Conn. 179, 201, 39 A.3d 712 (2012) (overruling in part *Aetna Casualty & Surety Co.* v. *Murphy*, 206 Conn. 409, 538 A.2d 219 [1988]); *State* v. *Payne*, 303 Conn. 538, 541–42, 564, 34 A.3d 370 (2012) (overruling *State* v. *King*, 187 Conn. 292, 445 A.2d 901 [1982], "and its progeny," and overruling in part *State* v. *Tomas D.*,

296 Conn. 476, 995 A.2d 583 [2010]); *State* v. *Kitchens*, 299 Conn. 447, 472–73, 10 A.3d 942 (2011) (overruling in part *State* v. *Ebron*, 292 Conn. 656, 975 A.2d 17 [2009]); *Bysiewicz* v. *DiNardo*, 298 Conn. 748, 778–79 n.26, 6 A.3d 726 (2010) (overruling *In re Application of Slade*, 169 Conn. 677, 363 A.2d 1099 [1975]); *State* v. *Connor*, 292 Conn. 483, 528 n.29, 973 A.2d 627 (2009) (overruling in part *State* v. *Day*, 233 Conn. 813, 661 A.2d 539 [1995]); *St. Joseph's Living Center, Inc.* v. *Windham*, 290 Conn. 695, 729 n.37, 966 A.2d 188 (2009) (overruling *Fanny J. Crosby Memorial, Inc.* v. *Bridgeport*, 262 Conn. 213, 811 A.2d 1277 [2002], and *United Church of Christ* v. *West Hartford*, 206 Conn. 711, 539 A.2d 573 [1988], to extent that those cases were inconsistent); *State* v. *DeJesus*, 288 Conn. 418, 437, 953 A.2d 45 (2008)[4] (overruling in part *State* v. *Sanseverino*, 287 Conn. 608, 949 A.2d 1156 [2008] [*Sanseverino I*], superseded in part by *State* v. *Sanseverino*, 291 Conn. 574, 969 A.2d 710 [2009] [*Sanseverino II*]); *State* v. *Salamon*, 287 Conn. 509, 513, 542, 949 A.2d 1092 (2008) (overruling entire line of cases interpreting kidnapping statutes as allowing conviction for kidnapping even when restraint involved was merely incidental to commission of another offense, most recently stated in *State* v. *Luurtsema*, 262 Conn. 179, 811 A.2d 223 [2002]); *Jaiguay* v. *Vasquez*, 287 Conn. 323, 348, 948 A.2d 955 (2008) (overruling in part *Johnson* v. *Atkinson*, 283 Conn. 243, 926 A.2d 656 [2007]); *State* v. *Grant*, 286 Conn. 499, 535, 944 A.2d 947 (overruling in part *State* v. *Whipper*, 258 Conn. 229, 780 A.2d 53 [2001]), cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008); *Gibbons* v. *Historic District Commission*, 285 Conn. 755, 771, 941 A.2d 917 (2008) (overruling in part *Stankiewicz* v. *Zoning Board of Appeals*, 211 Conn. 76, 556 A.2d 1024 [1989]).

The Chief Justice presided over many of the appeals in which this court overruled prior precedent. Accordingly, this court's existing practices in adhering—or not adhering—to the stare decisis principles that the Chief Justice currently invokes are relevant in evaluating the persuasiveness of her claim that the doctrine prevents this court from overruling *Santiago*. I note that many of this court's recent decisions overruling prior precedent include no discussion whatsoever of the doctrine of stare decisis. See, e.g., *Haynes* v. *Middletown*, supra, 314 Conn. 323 (overruling in part both *Purzycki* v. *Fairfield*, supra, 244 Conn. 101, and *Burns* v. *Board of Education*, supra, 228 Conn. 640, with no mention of stare decisis or underlying principles); *State* v. *Sanchez*, supra, 308 Conn. 78 (overruling in part *Finley* v. *Aetna Life & Casualty Co.*, supra, 202 Conn. 190, with no mention of stare decisis or underlying principles); *State* v. *Paige*, supra, 304 Conn. 446 (overruling in part *State* v. *Greenberg*, supra, 92 Conn. 657, with no mention of stare decisis or underlying principles). The Chief Justice's stated concern in her concurring opinion in

this case, that overruling *Santiago* would raise questions "about the court's integrity and the rule of law in the state of Connecticut," cannot be reconciled with the number of times this court has overturned its prior decisions without even considering whether doing so would be consistent with the doctrine.

These recent decisions also call into question the assertion of the Chief Justice that stare decisis must be adhered to in the present case because "neither the factual underpinnings of the prior decision nor the law has changed . . . ." She contends that one of these changes is necessary before a court may overrule a decision. Presumably, because she recognizes no exception for clearly wrong decisions despite its well established roots in our law, and because she obviously believes that *Santiago* was clearly wrong; see *State* v. *Santiago*, supra, 318 Conn. 231–341 (*Rogers, C. J.*, dissenting); she takes the position that even when a decision is clearly wrong, it must be accorded stare decisis effect unless one of these two conditions is present. She claims that in the absence of one or both of those two conditions, the decision to overrule prior precedent is based merely on "a present doctrinal disposition to come out differently from [the prior decision]." *Planned Parenthood of Southeastern Pennsylvania* v. *Casey*, supra, 505 U.S. 864.

In a case that was decided mere months ago, however, the Chief Justice joined the majority in overruling prior precedent, despite the absence of either of these two conditions. And in doing so, the court recognized a new cause of action, hardly a small change in the law. In *Campos* v. *Coleman*, supra, 319 Conn. 57, this court overruled *Mendillo* v. *Board of Education*, supra, 246 Conn. 456, 461, 477–96, in which the court had declined, based on an exhaustive analysis of the relevant policy principles and applicable precedent, to recognize a derivative cause of action for loss of consortium by a minor child. The justification provided by the court in *Campos* for overruling *Mendillo*, which had been decided by an en banc panel before the court adopted that practice for all cases, is illuminating: "Upon reconsideration of the relevant considerations, including the five factors that this court found determinative in *Mendillo*, we now agree with the concurring and dissenting opinion in *Mendillo* that the public policy factors favoring recognition of a cause of action for loss of parental consortium outweigh those factors disfavoring recognition." *Campos* v. *Coleman*, supra, 43. The opinion then proceeded to consider each of those factors and explain why the present panel now "disagree[d]"; id., 45; with the evaluation conducted by the panel in *Mendillo* of each of those factors. Id., 44–57. In other words, the panel in *Campos* simply disagreed with the conclusion arrived at by the panel in *Mendillo*, so *Mendillo* was overruled. Nothing in the factual underpinnings or the law had changed in the more than seven-

teen years since *Mendillo* was decided. The court in *Campos* relied on many of the identical authorities on which the court in *Mendillo* had relied, but the court in *Campos* arrived at a different conclusion.

One would expect, considering the Chief Justice's claim that the court is bound by the doctrine of stare decisis in the present case, that she would have expressed similar concerns regarding the risk that the court might appear to be deciding cases on the basis of the personal moral beliefs of individual justices, and that *Campos* would include an extensive and considered discussion of why stare decisis should not apply to *Mendillo*. Not so. Not only did *Campos* restrict its passing reference to the doctrine of stare decisis to a brief footnote, but it also misstated one of the basic principles underlying the doctrine. Id., 57 n.16. Specifically, as I have explained in this dissenting opinion, the exception to the doctrine of stare decisis for clearly wrong decisions is well established. That exception, however, is quite narrow, and does not apply to a decision when a current panel concludes merely that, although the original decision was "wrong," reasonable jurists could disagree. We have therefore limited the application of the "clearly wrong" exception to stare decisis to those instances when overruling prior precedent is compelled by "the *most cogent* reasons and *inescapable* logic . . . ." (Emphasis added; internal quotation marks omitted.) *Conway* v. *Wilton*, supra, 238 Conn. 660–61. The court in *Campos*, however, merely made the conclusory statement that its decision to overrule *Mendillo* was justified because "logic dictate[d] such a result." *Campos* v. *Coleman*, supra, 319 Conn. 57 n.16. This statement significantly lowers the bar. If all that were required in order for this court to overrule prior precedent was the present panel's conclusion that "logic dictated" that result, our definition of the word "precedent" would have to change radically.

Outside observers reading the *Campos* decision might be concerned that the *sole reason* for its conclusion was the *composition of the panel*. The Chief Justice, however, joined the majority, a position that is inconsistent with her concern in the present case to avoid the appearance of being driven by a mere doctrinal disagreement with the *previous panel*.

The Chief Justice's decision in *State* v. *DeJesus*, supra, 288 Conn. 418, is particularly problematic for her, because in that case, without any hesitation, she authored an opinion that accomplished precisely what she asserts today would so threaten the rule of law and the integrity of this court. In *Sanseverino I*, supra, 287 Conn. 612–13, decided less than two months before *DeJesus*, this court applied *State* v. *Salamon*, supra, 287 Conn. 509, to reverse the defendant's conviction for kidnapping. In *Salamon*, this court overruled a long

line of cases that had held that a conviction for kidnapping would lie even when "the restraint involved . . . [was] merely incidental to the commission of another offense perpetrated against the victim by the accused." Id., 513. The defendant in *Sanseverino I* had been convicted of both kidnapping and sexual assault. *Sanseverino I*, supra, 611–12. The majority in *Sanseverino I*, supra, 624, concluded that, under the new rule, which required that the state prove that the restraint involved was more than merely incidental to and necessary for the commission of the sexual assault, "no reasonable jury could have found the defendant guilty of kidnapping in the first degree on the basis of the evidence that the state proffered at trial." Accordingly, the proper remedy, the court concluded, was not a retrial on the kidnapping charge, but an outright acquittal. Id., 626. Justice Zarella dissented, arguing that the majority decision improperly had evaluated the sufficiency of the state's evidence presented at trial on the basis of the new rule. Id., 654. Justice Zarella observed: "The majority may be correct that, on the basis of the facts presented at the defendant's trial, the state did not demonstrate that the defendant perpetrated a restraint of the victim that has legal significance independent of the sexual assault. The state, however, had no knowledge when presenting its case to the jury that it was necessary to make such a showing." Id. (*Zarella, J.*, dissenting).

The Chief Justice, who had joined the majority in *Sanseverino I*, authored *State* v. *DeJesus*, supra, 288 Conn. 437, which, with the *addition of two new panel members*, overruled *Sanseverino I*. In *DeJesus*, the Chief Justice relied on the very same principles—in fact, the very same case law—that she and the other members of the majority in *Sanseverino I* had found unpersuasive less than two months earlier. Compare *Sanseverino I*, supra, 287 Conn. 648–64 (*Zarella, J.*, dissenting), with *State* v. *DeJesus*, supra, 288 Conn. 434–39. And she did so notwithstanding the objections of the dissent, which argued that the decision in *DeJesus* evinced a "lack of respect for the principle of stare decisis . . . ." *State* v. *DeJesus*, supra, 288 Conn. 529 (*Katz, J.*, dissenting). Specifically, the dissent in *DeJesus* levied an uncannily familiar accusation against the majority, stating that "[t]he majority's decision to overrule such *recent* precedent strikes at the very heart of [stare decisis]." (Emphasis added.) Id., 530 (*Katz, J.*, dissenting).

Writing for the majority in *DeJesus*, the Chief Justice quickly dismissed the dissenting opinion's arguments, voicing no concerns whatsoever that either the *subsequent panel* change or the quick nature of the about face presented any impediment to overruling *Sanseverino I*. *State* v. *DeJesus*, supra, 288 Conn. 437–38 n.14. This is particularly noteworthy for several reasons. First, as I have observed, the dissent expressly pointed out the

fact that *DeJesus* was released at a whiplash-inducing speed after *Sanseverino I*, which was controlling precedent as to the appropriate remedy for less than two months before the court changed its mind. Id., 529 (*Katz, J.*, dissenting). Second, the sole justification on which the majority in *DeJesus* relied for its decision to overrule *Sanseverino I* was that the rule announced was *clearly "wrongly decided."* (Emphasis added.) Id., 437 n.14. The opposite conclusion, the majority explained, was compelled by the most "inescapable logic . . . ." Id. This basis, that *Sanseverino I* was not merely wrong, but indisputably so, is the very same basis that the Chief Justice now asserts is somehow insufficient to overrule *Santiago*, despite her very public and very obvious belief that *Santiago* is clearly wrong. Lastly, I observe that because so little time passed between the publication of *Sanseverino I* and *DeJesus*, absolutely nothing had changed between the two decisions. This is particularly ironic, given the Chief Justice's insistence in the present case that in order for this court to overrule prior precedent, there must have been some subsequent change in the facts or the law, and that the conclusion that a decision was clearly wrong, on its own, is insufficient to justify a departure from stare decisis. One wonders what the Chief Justice might have responded in *DeJesus*, had the dissent pointed out, quite accurately, that "the only change that has occurred [since *Sanseverino I* was decided] is a change in the makeup of this court . . . ."

Do not misunderstand me to suggest that *State* v. *DeJesus*, supra, 288 Conn. 418, was wrongly decided. To the contrary, *DeJesus* is perfectly consistent with the doctrine of stare decisis, because *Sanseverino I*, supra, 287 Conn. 608, had ignored prior precedent. The panel in *DeJesus*, therefore, was required by the doctrine of stare decisis to overrule the portion of *Sanseverino I* that contravened well established precedent, regardless of how recently *Sanseverino I* had been decided, and regardless of whether there was a panel change. *DeJesus* repaired the fabric of the law. And *DeJesus* did so as quickly as possible, before the errant decision could do damage. That is precisely what we are asked to do in the present case.

The position of the Chief Justice, that when there has been a panel change, stare decisis precludes the court from overturning a recent, clearly wrong decision that flouted established precedent, conflicts with a fundamental principle underlying the doctrine of stare decisis, namely, that the doctrine, although grounded in stability and consistency, *cannot* be rigid. Otherwise, consistency and stability would require the court to follow precedent regardless of how wrong it may be. See *Conway* v. *Wilton*, supra, 238 Conn. 660 ("Stare decisis is not an inexorable command. . . . [A]lthough [s]tare decisis is a doctrine developed by courts to accomplish the requisite element of stability in court-

made law, [it] is not an absolute impediment to change. . . . [S]tability should not be confused with perpetuity. If law is to have a current relevance, courts must have and exert the capacity to change a rule of law when reason so requires." [Citations omitted; internal quotation marks omitted.]). As this court has stated on many occasions, it is more important to be right than to be consistent. Id.

The two "rules" that the Chief Justice focuses on in her concurring opinion in the present case are: (1) this court cannot overrule a decision following a panel change; and (2) this court cannot overrule a recently decided case. As to the first supposed rule, she points to no instance in which this court overruled prior precedent, where there had not been an *intervening panel change*. She also fails to cite to a single decision by this court declining to overrule a prior precedent on the basis that it was too recently decided. Assuming, however, for purposes of discussion, that these two rules bar the court from overruling prior precedent, her rigid application of these principles, if carried out in the manner that they suggest is appropriate, would guarantee that a clearly wrong decision would stand uncorrected.

An excellent illustration of this principle is this court's decision in *Tileston* v. *Ullman*, 129 Conn. 84, 86, 26 A.2d 582 (1942), appeal dismissed, 318 U.S. 44, 46, 63 S. Ct. 493, 87 L. Ed. 603 (1943), which declined to overrule *State* v. *Nelson*, 126 Conn. 412, 11 A.2d 856 (1940), based in part on the principle that "a change in personnel of the court affords no ground for reopening a question which has been authoritatively settled." Just as in the present case, there had been a panel change between the two decisions; the panels differed by one member because Justice Hinman, who had been on the panel in *Nelson*, had retired. In *Nelson*, the court had rejected a challenge to General Statutes (1930 Rev.) §§ 6246 and 6562, which together, as construed by the court, made it a criminal offense for a physician to prescribe contraceptives to a married woman, even when "the general health and well-being of the patient require[d] it." *Tileston* v. *Ullman*, supra, 85. The court in *Nelson* expressly left open the question of whether an exception should be read into the statutes when a physician has concluded that pregnancy would jeopardize the life of the woman, which the court acknowledged was a commonly recognized exception in abortion statutes at the time. *State* v. *Nelson*, supra, 418; *Tileston* v. *Ullman*, supra, 85.

The plaintiff in *Tileston* was a licensed physician who sought a declaratory judgment that General Statutes (1930 Rev.) §§ 6246 and 6562 allowed for an exception when a physician had concluded that pregnancy would place a woman's life in danger. Although this was precisely the issue that had been left unresolved by *Nelson*;

*State* v. *Nelson*, supra, 126 Conn. 418; the court in *Tileston* characterized the claim as one that would require it to overrule *Nelson*, and declined to do so, in part because the panel had changed. *Tileston* v. *Ullman*, supra, 129 Conn. 86.

In *Tileston*, the court's reliance on the panel change obviated any need to reexamine the problematic public policy principles on which *Nelson* had rested. Specifically, in *Nelson*, the court had explained that the statutes' "plain purpose" was "to protect purity, to preserve chastity, to encourage continence and self-restraint, to defend the sanctity of the home, and thus engender . . . a virile and virtuous race of men and women." (Internal quotation marks omitted.) *State* v. *Nelson*, supra, 126 Conn. 425. The court's choice of the word " 'virile' " is revealing, in light of its additional observation that "not all married [women] are immune from temptation or inclination to extra-marital indulgence, as to which risk of illegitimate pregnancy is a recognized deterrent deemed desirable in the interests of morality." Id., 424. Because the women at issue in the appeal were all married, any child born as a result of a so-called "illegitimate pregnancy" would not actually be "illegitimate"; putative father laws would prevent that. The purpose of the statutes, accordingly, was to protect the "virility" of husbands by preventing them from being made into cuckolds! It is easy to see why the panel in *Nelson* would deem such a public "purpose" to outweigh any concerns over women's general health.

Similarly, the panel in *Tileston* had no difficulty balancing that noble public "purpose" against the considerably greater risk presented to the female patients at issue in that case—death. Indeed, for those women, the court had a perfectly legal, alternative solution: "absolute abstention." *Tileston* v. *Ullman*, supra, 129 Conn. 92. Writing for the majority, Justice Ells, the only new panel member, even offered a helpful observation: "Certainly [absolute abstention] is a sure remedy." Id.

The decision in *Tileston* illustrates the dangers of the rigid application of stare decisis. The court in *Tileston* was able to rely in part on a panel change to justify its refusal to allow for a statutory exception that had not been dictated by prior precedent, despite the fact that the exception was commonly allowed in the much more extreme case of abortion. Id., 85, 86. Similarly, the Chief Justice is able to rely on the panel change in the present case to justify her refusal to overrule a decision that blatantly violated the doctrine of stare decisis. *Tileston* also starkly demonstrates the fallacy of concluding that this court risks the appearance that its decision is driven by the doctrinal disposition of the panel only when a new panel overrules prior precedent. Most importantly, *Tileston* highlights the principle that some decisions are so wrong that duty requires that the court overrule them. If a slightly different panel than the one in the

present case had decided yesterday that physicians could be prosecuted for providing contraception to female patients, I have no doubt that the Chief Justice would voice no concerns that the rule of law or integrity of this court would be imperiled by overruling that clearly wrong decision.

Of course, the best evidence that the Chief Justice improperly relies on the doctrine of stare decisis to justify her conclusion that *Santiago* should not be overruled is *Santiago* itself. That is, the overwhelming irony is that the Chief Justice relies on the doctrine of stare decisis in declining to overrule a decision that she herself recognized tramped merrily over this court's entire body of death penalty jurisprudence, in complete disregard of that doctrine.[5] The decision in *Santiago* rewrote history, contorted both this court's legal precedent and the legislative history of No. 12-5 of the 2012 Public Acts (P.A. 12-5), and blatantly substituted its own moral judgment for that of the people of this state. Good jurisprudence, not the present doctrinal disposition of a slightly different panel, would justify overruling such an abuse of judicial power. As the Chief Justice notes in her concurring opinion, the court's decision in *Santiago* "raise[d] legitimate concerns by the people we serve about the court's integrity and the rule of law in the state of Connecticut." We now have the opportunity to restore the faith of the people of this state in this court's respect for the rule of law. The doctrine of stare decisis requires that we take that opportunity.

Overturning *Santiago* would not require justices to decide the present case according to their personal moral beliefs. The Chief Justice explained in her dissenting opinion in that case that *Santiago* was decided and governed by "the majority's subjective sense of morality"; *State* v. *Santiago*, supra, 318 Conn. 277; and was completely contrary to what was dictated by existing precedent and the legislative history of P.A. 12-5. Id., 270–76. I agree with her. Even a jurist who is deeply, morally opposed to capital punishment, however, has a duty to follow the law. I agree with the Chief Justice that the majority in *Santiago* ignored that duty, and resolved the appeal on the basis of their personal, moral opposition to the death penalty. Id., 277. Overruling that decision now, not after the decision has been "on the books" long enough to be relied on as precedent, is the best way to adhere to the principle of stare decisis and repair the damage that has been done to the rule of law. The United States Supreme Court has made clear that when a court is called upon to overrule a recent decision that has violated stare decisis, the doctrine of stare decisis requires that the prior decision be overruled. See *Adarand Constructors, Inc.* v. *Pena*, supra, 515 U.S. 233–34. By focusing on the panel change, rather than the damage that *Santiago* inflicted on the rule of law, the Chief Justice loses sight of what needs to be done in the present case—the fabric of the law

must be repaired. And the only way to do that would have been to overrule *Santiago*.

I respectfully dissent.

[1] Given that my dissenting opinion does not address his concurring opinion, it is puzzling that Justice Palmer feels the need to respond to my dissent.

[2] I observe that unlike Chief Justice Rogers, Justice Robinson does not embrace the notion that there are any circumstances when stare decisis requires the court to adhere to a clearly wrong decision.

[3] See Black's Law Dictionary (9th Ed. 2009) (noting Latin phrase post hoc, ergo propter hoc is translated as " 'after this, therefore because of this,' " and defining phrase as "relating to the fallacy of assuming causality from temporal sequence; confusing sequence with consequence").

[4] The similarity in case names between *State* v. *DeJesus*, supra, 270 Conn. 826, and *State v. DeJesus*, supra, 288 Conn. 418, is purely coincidental. Hereinafter, all references in this dissenting opinion to *DeJesus* are to *State* v. *DeJesus*, supra, 288 Conn. 418.

[5] I also note the irony that *Santiago* itself involved multiple panel changes. Justices opted in and out of the panel while it was being considered by this court, yet no one seemed to be concerned that those panel changes would give rise to the public perception that the result of an appeal before this court depended on the composition of the panel. A summary of the panel changes in that case reveals that they were quite numerous.

I begin with the panel that decided *State* v. *Santiago*, 305 Conn. 101, 49 A.3d 566 (2012), which was argued on April 27, 2011, and was the same appeal that gave rise to the decision in *State* v. *Santiago*, supra, 318 Conn. 1. That panel was comprised of Chief Justice Rogers, and Justices Norcott, Zarella, McLachlan, Eveleigh, Harper and Vertefeuille. Over the course of the years during which the decision in *State* v. *Santiago*, supra, 305 Conn. 1, was pending before this court, the orders on the motions in that case reveal that Justice Palmer had recused himself from the case.

On May 9, 2012, more than one year after oral argument in *State* v. *Santiago*, supra, 305 Conn. 1, the defendant in that case filed a motion seeking permission to file a supplemental brief addressing the effect of No. 12-5 of the 2012 Public Acts on his appeal. The order denying that motion was issued by the same panel that heard oral argument in *State* v. *Santiago*, supra, 305 Conn. 101. The motion was denied "because, under the circumstances of this case, these constitutional issues would be more appropriately addressed in the context of postjudgment motions." Id., 308 n.167. The decision in *State* v. *Santiago*, supra, 305 Conn. 101, was released one month later.

On September 12, 2012, the original panel in *State* v. *Santiago*, supra, 305 Conn. 101, granted the defendant's renewed motion requesting permission to file a supplemental brief and his motion seeking permission to file a late motion for reconsideration. On September 14, 2012, the Chief Clerk of the Supreme Court notified the parties in a letter that Justice McLachlan, who was scheduled to leave the Judicial Branch at the end of that month, had withdrawn from the panel, and that Justice Palmer, "who is not recused on the legal issues implicated in the reconsideration, has been added to the panel." At that point in time, therefore, the panel in what was to become *State* v. *Santiago*, supra, 318 Conn. 1, now consisted of Chief Justice Rogers, and Justices Norcott, Palmer, Zarella, Eveleigh, Harper and Vertefeuille.

In November, 2012, Justice Harper reached the age of seventy. Although his continued participation in the case was authorized by this court's decision in *Honulik* v. *Greenwich*, 293 Conn. 641, 644, 658, 980 A.2d 845 (2009), and General Statutes § 51-198 (c), he withdrew from the panel. Similarly, although her status had not changed, and her continued participation in the case as a senior justice was authorized by § 51-198 (b), Justice Vertefeuille also withdrew from the panel. Justice McDonald and I were added to the panel after we joined the court, thus allowing the defendant's motion for reconsideration to be decided by all of the court's then current members. At that time, the panel in what was to become *State* v. *Santiago*, supra, 318 Conn. 1, now consisted of Chief Justice Rogers, and Justices Norcott, Palmer, Zarella, Eveleigh, McDonald and myself.

Oral argument was heard on the defendant's motion for reconsideration on April 23, 2013. Justice Robinson joined the court in December, 2013. Justice Norcott, at that time a judge trial referee, did not withdraw from the panel, and Justice Robinson was not added to it.

In the meantime, the present case was marked ready on May 13, 2014. At that time, the decision on the defendant's motion for reconsideration

was more than one year away from being published. See *State* v. *Santiago*, supra, 318 Conn. 1. Although the same issue presented in the motion for reconsideration in that case had been raised and briefed in the present case, and although the panel in the present case was comprised of the Chief Justice and sitting Associate Justices of this court, while the panel in *State* v. *Santiago*, supra, 318 Conn.1, was not, the court did not determine to address the issue in the present case.

The Chief Justice observes in her concurring opinion that in *State* v. *Santiago*, supra, 318 Conn. 1, "this court followed its standard procedures in determining which justices would sit on all phases of that case." I am not suggesting that the court did not follow its standard procedures; I merely observe that while the panel changes in that case were many and ongoing, in the end, those changes yielded the result that in one of the most important decisions this court has decided in recent history, the panel that decided the case was not comprised of all of the sitting justices of this court, contrary to this court's established policy in important cases. This could have been avoided if this court had resolved this issue in the present case.

———————————————